IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA


FILED
MAY - 9 2019
CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>)<br>v. )<br>)<br>JERRY HAYMON, )<br>a/k/a "Bear" )<br>)<br>Defendant. )<br>) | **UNDER SEAL**<br><br>Case No. 1:19-MJ-217 |

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR
A CRIMINAL COMPLAINT AND ARREST WARRANT**

I, Mark J. Grado, being duly sworn, depose and state the following:

**INTRODUCTION AND AGENT BACKGROUND**

1. I have been a Special Agent with the Federal Bureau of Investigation (FBI) since August 2014. Since January 2015, I have been assigned to a squad that investigates Criminal Enterprises and Violent Gangs out of the Washington Field Office (WFO), Northern Virginia Resident Agency.

2. As a Special Agent with the FBI, I have conducted physical surveillance, analyzed phone records, and participated in the application and execution of search warrants and arrest warrants for numerous defendants, including drug traffickers. As a narcotics investigator, I have interviewed many individuals involved in drug trafficking and have obtained information from them regarding the acquisition, sale, importation, manufacture, and distribution of controlled substances. I have also spoken to confidential sources, suspects, defendants, witnesses, and other experienced investigators concerning the methods and practices of drug

traffickers, as well as the inner-workings of major drug trafficking organizations. I have worked with undercover narcotics officers and have organized, planned and participated in undercover operations. Through my training and experience, I am familiar with the actions, habits, traits, methods, and terminology used by the traffickers and abusers of controlled substances.

3. I have been trained and certified as a Cellebrite Physical Operator and a Cellebrite Physical Analyst. This training and certification provided me an advanced knowledge and skillset for the capabilities and the operation of Cellebrite's cellphone hardware and software. I have used these tools numerous times to extract data from cellular phones and analyze the digital contents of these devices.

4. I have also become knowledgeable with the enforcement of state and federal laws pertaining to narcotics and dangerous drugs. Based on this experience, I have become well-versed in the methodology used in narcotics trafficking operations, the unique trafficking patterns employed by narcotics organizations, and their patterns of drug abuse. I have also interviewed convicted drug dealers who decided to cooperate with government officials. During these interviews, the drug dealers have explained their schemes to use and launder drug proceeds and their methods of operation. I have also spoken with other FBI, Drug Enforcement Administration (DEA), and Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) agents, as well as state and local law enforcement narcotics officers who have advised me when relating the substance of their similar experiences and the results of their own investigations and interviews. Based upon this experience, I have become knowledgeable of the methods and modes of narcotics operations, and the language and patterns of drug abuse and trafficking.

5. During this investigation, law enforcement has used several investigative tools, including a confidential informant, an undercover officer, narcotics controlled-buys, and search warrants for cellular phones and social media accounts.

6. I submit this affidavit in support of an application for a criminal complaint and arrest warrant for JERRY HAYMON, (also known as "BEAR"). I submit that the evidence described in this affidavit establishes probable cause to believe that between in and around August of 2013, and continuing through on or about December 6, 2017, within the Eastern District of Virginia and elsewhere, HAYMON did unlawfully, knowingly, and intentionally combine, conspire, confederate, and agree with other persons, both known and unknown, to unlawfully, knowingly, and intentionally distribute 100 kilograms of a mixture and substance containing a detectable amount of marijuana, a Schedule I controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 846.

7. All information in this affidavit is personally known to me, or has been related to me by other law enforcement officers, cooperating defendants, and records and documents gathered during this investigation. This affidavit contains information necessary to support probable cause. It is not intended to include each and every fact and matter observed by me or known to the government.

## INVESTIGATION BACKGROUND

8. In March of 2017, the ATF and FBI began jointly investigating members of a set of the United Bloods Nation street gang. The set, called the Imperial Gangsta Bloods (IGB), was comprised of several narcotics traffickers and violent criminals who engaged in criminal activity in Northern Virginia, Washington, D.C, and elsewhere.

3

9. In March of 2017, the joint investigation targeting IGB identified NASIRU CAREW as an associate of Tarvell VANDIVER, the leader of the IGB set. CAREW was the leader of a drug trafficking organization (DTO) with several members operating in Maryland, California, the Eastern District of Virginia, and elsewhere. CAREW and his subordinates purchased large quantities of marijuana and Tetrahydrocannabinol (THC) edible products in California and shipped them for distribution in Virginia, Maryland, California, and elsewhere. CAREW would instruct his associates to retrieve these shipped parcels from addresses around Maryland and Virginia and deliver them to him to distribute. Members of his DTO often were armed during these deliveries.

10. On December 6, 2017, CAREW and nine members of his distribution organization were arrested pursuant to a criminal complaint issued in the Eastern District of Virginia. At the time of CAREW's arrest in Maryland, he was in possession of approximately 82 pounds of marijuana, vacuum-sealed in one-pound packages ready for distribution. CAREW's residence in California also contained distribution amounts of marijuana, THC, MDMA or "Ecstasy," and packaging material required to ship these drugs through the United States Postal Service, and other parcel delivery companies. On April 13, 2018, CAREW pled guilty before the Honorable Judge Liam O'Grady, United States District Judge, to possession of and conspiracy to distribute 1,000 kilograms or more of marijuana and THC, in violation of Title 21, United States Code, Sections 841 and 846. Additionally, CAREW's nine co-conspirators pled guilty to drug distribution and firearms charges.

11. Cooperating Defendant-1 ("CD-1") was a member of CAREW's DTO and has pled guilty to possession of and conspiracy to distribute marijuana and THC. CD-1 has personally communicated with the members of the CAREW DTO regarding acquiring and

selling marijuana and THC. CD-1 has personally communicated with HAYMON over the phone and on social media regarding the purchasing and shipment of controlled substances using the U.S. Postal Service and other parcel couriers. Additionally, CD-1 has met HAYMON in person and provided him with money to purchase controlled substances for shipment to locations in the Eastern District of Virginia. CD-1 has personal knowledge of the methods of communication utilized by the CAREW DTO in order to communicate and coordinate their distribution activities amongst its members. CD-1 has been corroborated through the review of his phone and statements by other cooperating defendants, and has been found to be reliable. CD-1 has agreed to cooperate with the United States Government because he hopes to receive consideration for a lesser sentence. CD-1 has been and will be referred to in the masculine gender, regardless of CD-1's true gender.

12. Cooperating Defendant - 2 ("CD-2") was a personal friend and narcotics business partner of CD-1. CD-2 has pled guilty to two counts of conspiracy to distribute cocaine and heroin. CD-2 and CD-1 have conspired to purchase marijuana from several California sources of supply, to include HAYMON. CD-2 has personally met HAYMON and has provided him money to purchase controlled substances. CD-2 has agreed to cooperate with the United States Government because he hopes to receive consideration for a lesser sentence. CD-2 will be referred to in the masculine gender, regardless of CD-2's true gender.

13. Cooperating Defendant - 3 ("CD-3") was a personal friend and narcotics business partner of CD-1. CD-3 has agreed to speak to the government pursuant to a proffer agreement and has agreed to cooperate pending a plea agreement. CD-3 and CD-1 have conspired to purchase marijuana and THC from several California sources of supply. CD-3 has personally met HAYMON and has been present with both CD-1 and HAYMON at the same time. CD-3

has agreed to cooperate with the United States Government because he hopes to receive consideration for a lesser sentence. CD-3 will be referred to in the masculine gender, regardless of CD3's true gender.

## PROBABLE CAUSE

A. <u>Interviews identifying HAYMON as CAREW's supplier</u>

14. On April 17, 2018, law enforcement interviewed CD-1. During this interview, CD-1 stated that since 2013, he has been supplied marijuana from a person named "JERRY HAMON." CD-1 met HAYMON through a social media account and began discussing the purchasing and shipment of marijuana from California to Virginia. CD-1 then began providing HAYMON with addresses located in the Eastern District of Virginia which were used as delivery locations. These addresses were provided by CAREW and members of CAREW's distribution organization.

15. After numerous successful deliveries, CD-1 and HAYMON decided to increase the amount of marijuana they would begin purchasing. CD-1 said that in 2014, he flew to California where he met HAYMON in a hotel and provided him with approximately $15,000 to $20,000 to purchase larger amounts of marijuana. CD-1 said that he had made several trips to California following this trip in order to provide tens of thousands of dollars to HAYMON for the purpose of buying and shipping marijuana. CD-1 would also wire HAYMON payment for the marijuana orders using several bank accounts provided by HAYMON. This method of ordering marijuana and shipping them using parcel carriers continued until December of 2017.

16. On May 21, 2018, law enforcement interviewed CD-1. During this interview, law enforcement showed CD-1 a known photograph of HAYMON from his social media account.

6

CD-1 positively identified the person in the photograph as HAYMON and as the person he knew as "Bear."

17. On September 4, 2018, law enforcement interviewed CD-2. During the interview, CD-2 stated that he was introduced to HAYMON through CAREW. CD-2 stated that he had traveled to California and met HAYMON in person. When he met HAYMON, they discussed types of marijuana that he (HAYMON) was selling. CD-2 gave HAYMON approximately $40,000 in cash in exchange for an order of approximately 25 pounds of marijuana. CD-2 also stated that members of CAREW's DTO obtained delivery addresses where the marijuana parcels could be shipped. These addresses were then sent to HAYMON in California where he packaged and shipped the parcels to the Eastern District of Virginia and elsewhere. CD-2 was shown a picture of HAYMON from his social media account and positively identified him as the person he met in California.

18. On September 27, 2018, law enforcement interviewed CD-3. During the interview, CD-3 stated that he was introduced to HAYMON through CAREW. CD-3 stated that CAREW introduced HAYMON as one of his marijuana suppliers. During the meeting, CD-3 was told that HAYMON has supplied CAREW a lot of marijuana in the past. In another interview, CD-3 stated to law enforcement that he was present in an apartment in San Diego, California with CAREW and HAYMON. During that time he heard CAREW and HAYMON discussing buying and selling marijuana. CD-3 also stated that HAYMON and CAREW discussed several packages of money and marijuana which they had sent to Virginia which were confiscated by law enforcement. CD-3 was shown a picture of HAYMON from his social media account. CD-3 positively identified the person in the photograph as the person he was introduced to in California and as CAREW's marijuana supplier called "Bear."

7

B.  **Identification of phone numbers used by HAYMON**

19.  Based on a review of the contact lists found on several of CAREW's seized cell phones, I issued administrative subpoenas for several phone numbers associated with HAYMON, or "Bear." All phone numbers associated were registered to HAYMON with the same address located on West Birch Avenue, Fresno, California.

20.  Phone number 559-917-5565 (hereinafter "5565 Number") returned the Financial Liable User and User's name as JERRY HAYMON, with an address located on West Birch Avenue, Fresno, California. The 5565 Number was active from November 11, 2009 to October 15, 2016.

21.  An administrative subpoena issued for HAYMON associated phone number 559-708-8726, (hereinafter "8726 Number") returned the Financial Liable User and User's name as JERRY HAYMON, with an address located on West Birch Avenue, Fresno, California. The 8726 Number was active from October 6, 2013 to January 29, 2014.

22.  An administrative subpoena issued for HAYMON associated phone number 559-250-8034, (hereinafter "8034 Number") returned the Financial Liable User and User's name as JERRY HAYMON, with an address located on West Birch Avenue, Fresno, California. The 8034 Number has been active from October 15, 2016 to June 13, 2018.

C.  **Review of cell phones seized from CAREW in 2017**

23.  On December 6, 2017, law enforcement seized several cell phones from two locations where CAREW resided. These cell phones were searched pursuant to search warrants obtained in the Eastern District of Virginia and the Southern District of California. A review of the communications found that the cell phones contained numerous conversations between CAREW and HAYMON's 5565 Number.

8

24. For example, on October 28, 2014, CAREW and HAYMON discussed how to get money from CAREW in Virginia to HAYMON in California:

| | |
|---|---|
| HAYMON: | And think ok u get four ppl to fly make them all fly different days don't do same flight. 4 ppl 30 each. |
| HAYMON: | Yo |
| CAREW: | Whatup |
| HAYMON: | What you think of. Yo |
| CAREW: | Whatup |
| HAYMON: | What u thinking? 4 options send someone on train drive fly or mail bread |
| CAREW: | Train don't sound bad |
| HAYMON: | They get they own bed it's a 82 hours train ride like 3 days |

Several days later, on November 4, 2014, CAREW and HAYMON continued the conversation:

| | |
|---|---|
| CAREW: | Wanna come today..but still collecting |
| HAYMON: | How much you bringing |
| CAREW: | 40 or better |

25. Based on my experience and the facts of this case, I know that CAREW had traveled to California to meet HAYMON in person and provided him with approximately $40,000 in cash to purchase marijuana for shipment to locations in Virginia. I also believe there is probable cause to believe that CAREW and HAYMON were discussing several different ways to transport cash from CAREW to HAYMON in order to purchase controlled substances.

D. <u>Search warrants executed on CAREW's cellular phones from 2014</u>

26. Based on the evidence from CAREW's cellular phones that were seized on December 6, 2017, and on the information from cooperating defendants, law enforcement obtained a federal search warrant from the Eastern District of Virginia to search additional

cellular phones belonging to CAREW that had been seized by law enforcement in 2014. The search for additional evidence of CAREW's conspiracy with HAYMON uncovered numerous additional drug-related conversations between CAREW and HAYMON's 5565 Number, and also between CAREW and HAYMON's 8726 Number.

27. For example, on January 5, 2014, CAREW and HAYMON's 8726 Number exchanged the following text message conversation:

| | |
|---|---|
| Carew: | That's a bet..yall kniw I lost over 200k while yall was stacking. So I gotta get mines now.. it will be soon |
| Haymon: | Bet shit I wish I had 200 |
| Carew: | Shit we made that shit together plus side shit I was dong...but we done made over 500k between us since established. U aint seeing it..cause we spending like shit |
| Haymon: | We???? Shit hell no I prolly clocked 55 aint's got it |
| Carew: | Shit we go in now hard by my bday I want 500k but will take half of that. Damn right we between u me and my bro |
| Haymon: | Yep bet |

28. Based on my training, experience and the facts of this case, I know that CAREW and HAYMON were discussing the fact that CAREW had lost over $200,000 while HAYMON and his co-conspirators were making money selling marijuana to CAREW. I also know that CAREW stated to HAYMON that his personal goal was to make $500,000 by his birthday, and that he planned to make this money working with HAYMON.

29. Then, on January 10, 2014, CAREW and HAYMON's 8726 Number exchanged text messages regarding packages of controlled substances which had not been retrieved after HAYMON mailed them to CAREW from California:

| | |
|---|---|
| Haymon: | I Guarantee when I send your 10 u gone be right there to get it. I treat yo |

|          | |
|----------|---|
|          | bread like it's mine I do Ur boxes like its mind I don't let another nigga handle it..Fee me I thoygt u was there to get the pack |
| Carew:   | U Insulting me now dog...I don't need a fuckng penny from you..never been a thief ..I rob niggas face off..I aint no petty fucking thief..wat da fyck is 10 tracks gonna do for me dog. I'll never go below wat I'm worth...The same way I operate my shit is the same way I do Yours..your money my money..wat sense does it make for me to destroy wat I've been building to get to millions to squander over a penny.. |

30. Based on my training, experience and the facts of this case, I know that when CAREW and HAYMON discussed 10 tracks, this was code for 10 pounds of marijuana. I also know that CAREW and HAYMON saw their distribution operation as a joint business venture with the goal of profiting from the sales of millions of dollars' worth of marijuana.

31. On January 24, 2014, HAYMON sent CAREW several text messages regarding a marijuana-filled package that he (HAYMON) sent to CAREW. This package did not make it to the destination address. HAYMON texted CAREW the following message.

| HAYMON: | My bro said either it was popped at the office or taken..Cus he said he called in on a box 2 weeks ago and the manager got on the phone and told him sir we found marijuana and do u know that's a felony but he called from a pay phone. Ima send u pic of the slip |
|---------|---|

Approximately 30 minutes later, HAYMON texted CAREW the message below:

| HAYMON: | "idk what the fuck happened but I ain't using usps bro that shit felt sketchy. |
|---------|---|

32. Based on my training, experience and the facts of this case, I know that HAYMON was telling CAREW that a co-conspirator had mailed a package of marijuana to CAREW using the United States Postal Service ("USPS") and that the package was seized by the

11

Postal Service. When the co-conspirator called the Post Office inquiring about the package, he learned that they had seized the parcel and had found marijuana inside the package. The Post Office had also warned HAYMON's co-conspirator that shipping marijuana through the USPS was a felony.

33. A review of the text communications between one of CAREW's phones and HAYMON's 5565 Number also revealed several drug-related conversations. For example, on January 15, 2014, CAREW and HAYMON texted a Wells Fargo bank account number and name associated with the account. They then had the following conversation.

> CAREW: One more 10 then a quarter or more plays.
>
> CAREW: Tomorrow or Thursday, wen u producing
>
> HAYMON: Yo I'm sending cherry pie it's coo but I got so many flavors just seeing which one best heard it smoke good
>
> CAREW: Aight mix em half n half
>
> HAYMON: Oh they already boxed up they out in the am

34. Based on my training and experience, I know that CAREW was communicating that he is ready to start receiving "quarter plays" or 25-pound shipments of marijuana after he receives the next shipment of 10 pounds. I also know that cherry pie is a strain of marijuana and that HAYMON stated he has already prepared and packaged a shipment of this strain for CAREW.

35. On January 23, 2014, CAREW and HAYMON had a text message discussion regarding the frequency of their distribution business:

> CAREW: We gotta move carefully n not get pushy or greedy..enjoy our freedom
>
> HAYMON: You right bro we getting to money hungry u know we gotta o back to the mail to use fed ex for the bread I will FaceTime u to show u how to wrap

      it up do you got a sealer?

CAREW:   Yea..hit u in a lil bit..lil tied up

E.   Review of HAYMON's cellular phone

36.  On September 16, 2015, HAYMON was arrested by the Fresno Police Department and his cellular phone was seized and maintained in the Fresno Police Department's evidence vault. Based on communication between CAREW and HAYMON which was observed on CAREW's cellular phones, law enforcement was granted a federal search warrant, issued out of the Central District of California, to search the contents of HAYMON's cellular phone.

37.  A review of the contents of the phone found the cell phone number to be 5565, which was identified as belonging to HAYMON during the time of his arrest in Fresno. Law enforcement additionally found numerous drug related conversations with CAREW and several other unidentified individuals. For example, on June 1, 2015, CAREW and HAYMON had a text message conversation regarding purchasing marijuana:

CAREW:   Smh ok nigga how much and is they good I need them to look and be good foreal I don't want to go through that bs like last time please so how much u gonna hit me 4 the 10

HAYMON:   What last time? They 18

CAREW:   They indoor

HAYMON:   What? No just like the last ones green house why would I charge U 18 for indoor

38.  CAREW and HAYMON later continue their conversation:

CAREW:   My sister just sent 9 and other chick gone send the other 9 in an hour

HAYMON:   Which one u use first

CAREW:   BOA. What u give me good indoor for

HAYMON: I gotta go get it so like 25. But only if u get 10 ain't driving for no 5.

[Haymon then provides CAREW the name and number of a BOA bank account]

39. Based on my training, experience and the facts of this case, I know that the text message communication between CAREW and HAYMON on June 1, 2015 is a discussion about purchasing marijuana. I know that marijuana is grown in indoor grow operations as well as green houses. I know that when HAYMON is telling CAREW 18 he is stating that the marijuana costs $1,800 per pound. I also know that CAREW later asks HAYMON what the price would be for good indoor marijuana. HAYMON responds with a 25, which means $2,500 per pounds and that he would only drive to buy the marijuana if CAREW purchased 10 pounds.

40. In addition to numerous drug related text messages between CAREW and HAYMON, law enforcement also observed several images of marijuana to include distribution quantities of marijuana in large plastic bags as well as approximately 50 potted plants that appear to be marijuana plants.

41. Law enforcement also observed numerous web and Google title searches on HAYMON's phone to include:

    a. Track your package or shipment with FedEx

    b. 4 months of a marijuana plat outside can yield how much

    c. How much marijuana does a marijuana plant yield

    d. Drying marijuana

    e. The costs and Revenues of Growing Marijuana

    f. How many gallons of nutrients are used for 50 plants of marijuana

42. Based on my training and experience, I believe that these web history searches are related to HAYMON's research in the productions and distribution of marijuana.

F. <u>Findings for HAYMON's social media account</u>

43. Based on the information provided by CD-1 and CD-2 as well as communication between identified between CAREW's social media account HAYMON's social media account, law enforcement obtained a federal search warrant out of the Eastern District of Virginia HAYMON's social media.

44. The social media return documented that the account was created on approximately May 15, 2013 with a subscriber email address of bearhaymon@aol.com. The social media account's display name was set as "Bear." The account had a subscriber phone number of 559-355-0982. Law enforcement contacted this number in November of 2018. The person who answered the phone call told law enforcement they were HAYMON. A review of the social media account found many drug related messages between HAYMON and CAREW as well as numerous photographs and videos of marijuana.

45. For example, on May 22, 2017, CAREW sent an address to HAYMON's social media account with an address on Seminole Street in Hyde Park, Massachusetts ("Seminole Street"). A USPS label with this address was found on a CAREW's cell phone. CD-1 and CD-3 have stated during interviews with law enforcement that they have mailed packages of marijuana to customers in Massachusetts for several years. An image of a U.S. Postal Service label with this address was also found on CAREW's cellular phone. A USPS database search of the Seminole Street address show that between the dates March 7, 2017 and April 28, 2017, the Seminole Street address received approximately 9 parcels with a total shipping weight of 88.38 pounds.

46. Also, according to USPS parcel database records, on August 23, 2017, the Seminole Street address received a 2.8 pound parcel from a location in Riverdale, Maryland. I

15

know CAREW's primary residence was located in Riverdale, Maryland. CAREW was also arrested at his Riverdale, Maryland residence, where he was found in possession of 82 pounds of marijuana individually packaged into one-pound vacuum-sealed packages for distribution.

47. On June 2, 2017, CAREW received several messages from HAYMON's social media account. The messages are as follows:

> "I'm tryna push out tomorrow so let me know if u come up with change just bust em idc Judy give me a good # where I can go to humbolt and at least grab 20 feel me"

> "Then I can have 50 og and u have 50 og for like 1%2C000 each.. feel me now we back to 700 to a stack each one ima get a grower who gone let em go for 8-900 watch I'll find im up front while crop 90k. Fuck growing frank went to the source.

48. Based on my training, experience and the facts and circumstances of this case, I know that the term "OG" is a slang term used for a strain of marijuana. I believe that when HAYMON and CAREW mention "50 og," they are discussing an order of approximately 50 pounds of the strain Ocean Grown marijuana. Based on my experience, I also know that HAYMON is telling CAREW that he will find a marijuana grower to sell him a pound of marijuana for $800 - $900 and that they will pay the grower $90,000 total for the marijuana.

49. On June 21, 2017, HAYMON sent a nine second video recording to an unknown social media account. The video shows approximately twelve plastic bags filled with a green leafy substance. The video camera slowly pans to HAYMON sitting on a stool with a strainer containing green leafy substances. The video then pans to HAYMON's face.

50. Based on my training and experience, I know that marijuana suppliers fill plastic oven bags, often called "turkey bags" with dried marijuana to transport prior to the seed removal

16

process and vacuum sealing for mail shipment. I believe there is probable cause to believe that HAYMON had purchased marijuana filled in "turkey bags" and videotaped himself removing marijuana seeds using this strainer.

G. FRESNO Parcels to the Eastern District of Virginia

51. According to the United States Postal Inspection Service ("USPIS"), between August 6, 2013 and July 17, 2017, law enforcement found evidence of approximately 40 parcels were mailed from areas around Fresno, California and Sacramento, California to locations in the Eastern District of Virginia and Maryland. Both locations are areas HAYMON has documented as his residence with the California DMV. The shipping weight of these parcels totaled approximately 356 pounds. The USPIS intercepted and searched five of the parcels from originating from Fresno with delivery locations to addresses in Prince William County. Federal search warrants executed on these packages found a total of approximately 42 pounds of marijuana.

52. According to USPIS records, on October 16, 2013, a one-pound parcel was shipped from the Woodbridge residence with a sender name of "Nas Carew" to an address located on Birch Avenue in Fresno, California and addressed to "Joshua Haymon." According to California Department of Motor Vehicles (DMV) records, HAYMON is a resident of the Birch Avenue address.

53. On November 13, 2013, law enforcement seized a three-pound parcel shipped from a location within the Eastern District of Virginian to an address on North Tamera Avenue in Fresno, California. A narcotics canine presented a positive response to the parcel, so law enforcement obtained a search warrant for the parcel. Law enforcement discovered approximately $52,500 in U.S. currency inside the parcel wrapped in two vacuum-sealed bags.

According to California DMV records, HAYMON had used the North Tamera Avenue residence as an address of record until January 8, 2015. During an interview with law enforcement, CD-1 stated that he had sent this package to HAYMON for the purpose of purchasing marijuana for shipment to locations in Virginia.

54. The chart below displays the USPIS records documenting parcels from several locations in and around Fresno, California to locations around Woodbridge, Virginia. The yellow highlighted parcels show parcels containing marijuana seized by the USPIS. The green highlighted parcel shows the $52,500 cash seizure shipped from the Woodbridge, Virginia location to HAYMON's North Tamera Avenue address in Fresno, California.

| Label Number | Label Date | Lbs | Sender City | State | City | State | Contents |
|---|---|---|---|---|---|---|---|
| EM744094544US | 08/06/13 | 1 | FRESNO | CA | WOODBRIDGE | VA | |
| EU956001718US | 08/20/13 | 4 | FRESNO | CA | WOODBRIDGE | VA | |
| EU956001620US | 08/20/13 | 4 | FRESNO | CA | WOODBRIDGE | VA | |
| 14901159815759813456 | 09/04/13 | 3 | Visalia | CA | WOODBRIDGE | VA | |
| EU900394660US | 09/19/13 | 8 | FRESNO | CA | WOODBRIDGE | VA | |
| EU928128531US | 09/19/13 | 2 | FRESNO | CA | WOODBRIDGE | VA | |
| EU928130226US | 09/26/13 | 4 | FRESNO | CA | DUMFRIES | VA | |
| EU929658204US | 10/01/13 | 10 | FRESNO | CA | WOODBRIDGE | VA | |
| EU988216851US | 10/03/13 | 9 | CLOVIS | CA | WOODBRIDGE | VA | |
| EU956005312US | 10/08/13 | 8 | FRESNO | CA | WOODBRIDGE | VA | |
| EU972343849US | 10/16/13 | 9 | FRESNO | CA | DALE CITY | VA | |
| EI252657328US | 10/16/13 | 1 | DALE CITY | VA | FRESNO | CA | Carew to Haymon |
| EU988217260US | 10/18/13 | 8 | FRESNO | CA | WOODBRIDGE | VA | |
| EU972344402US | 10/28/13 | 15 | FRESNO | CA | WOODBRIDGE | VA | |
| EU972344416US | 10/28/13 | 12 | FRESNO | CA | WOODBRIDGE | VA | |
| EU985183434US | 10/31/13 | 11 | FRESNO | CA | DALE CITY | VA | |
| EU985183417US | 10/31/13 | 11 | FRESNO | CA | WOODBRIDGE | VA | |
| EU928129506US | 11/07/13 | 19 | FRESNO | CA | DALE CITY | VA | |
| EU928129510US | 11/07/13 | 19 | FRESNO | CA | DALE CITY | VA | |
| EU972344420US | 11/13/13 | 10 | FRESNO | CA | DALE CITY | VA | |
| EU988212829US | 11/13/13 | 11 | FRESNO | CA | WOODBRIDGE | VA | 7Lb 3oz MJ |
| EI164492820US | 11/18/13 | 8 | | | FRESNO | CA | $52,500 USC |
| EU988212863US | 11/20/13 | 15 | FRESNO | CA | DALE CITY | VA | |
| EK078697187US | 11/26/13 | 10 | | | WOODBRIDGE | VA | |
| EK079538828US | 12/13/13 | 17 | FRESNO | CA | WOODBRIDGE | VA | |
| EU988212700US | 12/30/13 | 14 | FRESNO | CA | DALE CITY | VA | |
| EU929657535US | 01/06/14 | 15 | FRESNO | CA | WOODBRIDGE | VA | |
| EU929660335US | 01/09/14 | 15 | FRESNO | CA | WOODBRIDGE | VA | |
| EU929660344US | 01/09/14 | 15 | FRESNO | CA | WOODBRIDGE | VA | |
| EK039258921US | 01/15/14 | | CLOVIS | CA | WOODBRIDGE | VA | 7Lb 10oz MJ |
| EK039258918US | 01/15/14 | | CLOVIS | CA | WOODBRIDGE | VA | 6Lb 9oz MJ |
| EK013691171US | 01/17/14 | 14 | Fresno | CA | WOODBRIDGE | VA | |
| EU974937536US | 01/21/14 | 12 | FRESNO | CA | DUMFRIES | VA | 9Lb 13oz MJ |
| EK077471902US | 01/29/14 | | FRESNO | CA | WOODBRIDGE | VA | 11Lb 2oz MJ |
| 9505511029175181538877 | 06/30/15 | | Visalia | CA | WOODBRIDGE | VA | |

19

| Label Number | Label Date | Lbs | Sender City | State | City | State | Delivery Date |
|---|---|---|---|---|---|---|---|
| 9505500012287071000020 | 3/12/2017 | | FRESNO | CA | HAMPTON | VA | 3/15/2017 |
| 9505514544297007071735 | 1/7/2017 | 5.5 | VISALIA | CA | LAUREL | MD | 1/9/2017 |
| 9505514544267023082381 | 1/23/2017 | 5.62 | VISALIA | CA | LAUREL | MD | 1/25/2017 |
| 9505514544297034081073 | 2/3/2017 | 4.56 | VISALIA | CA | LAUREL | MD | 2/6/2017 |
| EL550373193US | 2/15/2017 | 6.06 | VISALIA | CA | LAUREL | MD | 2/17/2017 |
| 9505516490837072014059 | 3/13/2017 | 9.94 | FRESNO | CA | LAUREL | MD | 3/15/2017 |
| 9113151490000094278424 | 3/13/2017 | 4.31 | FRESNO | CA | WOODBRIDGE | VA | 3/15/2017 |
| 9505513823077189101416 | 7/8/2017 | 6.75 | SACRAMENTO | CA | ABERDEEN | MD | 7/10/2017 |
| 9505513823067236085424 | 8/24/2017 | 5.62 | SACRAMENTO | CA | ABERDEEN | MD | 8/26/2017 |
| 9505513007066342041508 | 12/7/2016 | 1.81 | WEST SACRAMENTO | CA | HYATTSVILLE | MD | 12/10/2016 |
| 9505513007067195107267 | 7/14/2017 | 0.88 | WEST SACRAMENTO | CA | HYATTSVILLE | MD | 7/17/2017 |

## CONCLUSION

55. Based upon the foregoing, I submit there is probable cause to believe that between in and around August of 2013 and continuing through on or about December 6, 2017, in Prince William County and elsewhere, JERRY HAMON, did unlawfully, knowingly, and intentionally combine, conspire, confederate and agree with CAREW, CD-1, CD-2, and others, both known and unknown, to unlawfully, knowingly, and intentionally distribute 100 kilograms or more of a mixture and substance containing a detectable amount of marijuana, a Schedule I controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 846.

Mark J. Grado
Special Agent
Federal Bureau of Investigation

Sworn and subscribed to me this ___May 9___, 2019.

/s/
Ivan D. Davis
United States Magistrate Judge

20